UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
CHARLES MILLS, CRAIG SOTOMAYOR, and
BRADEN HOLLIDAY,

                          Plaintiffs,                Case No.: 23 Civ. 7460

       -against-

                                          **COMPLAINT**

NEW YORK CITY, New York,
                          Defendant.
-----------------------------------------------------------------x

      Plaintiffs, CHARLES MILLS, CRAIG SOTOMAYOR, and BRADEN HOLLIDAY, by

and through their attorneys The Bellantoni Law Firm, PLLC, for their Complaint respectfully state:

## NATURE OF THE ACTION

      1.      This is an action for declaratory, injunctive, and other relief, to include presumed

nominal damages, compensatory damages, costs, disbursements, and reasonable statutory

attorney's fees pursuant to 42 U.S.C. § 1988, for continuing irreparable harm to the plaintiffs

arising from violations to their constitutional rights as codified in and protected under the Second

and Fourteenth Amendments to the United States Constitution. 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

      2.      Jurisdiction in this court is proper pursuant to 28 U.S.C. § 1331 in that this action

arises under the United States Constitution and laws of the United States, and under 28 U.S.C. §

1343(a)(3) in that this action seeks to redress the deprivation, under of color of the laws, statutes,

ordinances, regulations, customs, and usages of the State of New York, of rights, privileges or

immunities secured by the United States Constitution. This action also seeks relief pursuant to 28

U.S.C. §§ 2201, 2202, and 42 U.S.C. § 1983, § 1988. Venue in this district is proper pursuant to

28 U.S.C. § 1391.

**THE PARTIES**

3.      Plaintiff, Charles Mills ("Mills") is a citizen of the United States and a resident of Queens County, State of New York.

4.      Plaintiff, Craig Sotomayor ("Sotomayor") is a citizen of the United States and a resident of Nassau County, State of New York.

5.      Plaintiff, Braden Holliday ("Holliday") is a citizen of the United States and a resident of Bronx County, State of New York.

6.      Defendant, New York City, New York (the "City") is a municipal corporate subdivision of the State of New York duly existing by reason of and pursuant to the laws of the State.

**CONSTITUTIONAL FRAMEWORK**

7.      The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

8.      The Second Amendment codifies a *preexisting* right, which means that individuals have an *inherent* right to possess and/or carry weapons in common use, including firearms[1] - the ability to engage in that conduct was not *given* to them by the government.

> "[I]t has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right.
>
> The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.'

---

[1] Handguns and long guns.

2

As we said in *United States v. Cruikshank* …[t]his is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed...”[2]

9.     The Second Amendment right of “the people…unambiguously refers to all members of the political community, not an unspecified subset.” *Heller*, at 580.

“ ‘[T]he people’ seems to have been a term of art employed in select parts of the Constitution .... [Its uses] sugges[t] that ‘the people’ protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.”

*Heller*, at 580 quoting *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990).

10.     The Fourteenth Amendment provides, in pertinent part: No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. U.S. Const. amend. XIV.

11.     The Second Amendment presumptively protects the preexisting right to possess and carry all weapons in common use for self-defense. *Bruen*, at 2132 (“even though the Second Amendment’s definition of ‘arms’ is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense”) citing, *Caetano v. Massachusetts*, 577 U.S. 411, 411–412 (2016) (per curiam) (stun guns).

12.     Handguns are weapons in common use for self-defense and are protected within the scope of the Second Amendment. *Heller,* at 628 (recognizing handguns to be “an entire class

---

[2] *D.C. v. Heller*, 554 U.S. 570, 592 (2008) (emphasis supplied) quoting, *United States v. Cruikshank*, 92 U.S. 542, 553 (1876) (quotation marks omitted).

of 'arms' that is overwhelmingly chosen by American society for that lawful purpose [self-defense].").

13.     In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court reiterated the text, history, and tradition standard of reviewing Second Amendment challenges, consistent with *Heller*, *McDonald*[3], and *Caetano*.[4]

14.     Flatly rejecting the 'interest balancing' 'intermediate scrutiny' test created by the Second Circuit (and others), the *Bruen* Court laid out a clear path to determine the constitutionality of government regulations affecting the Second Amendment: "We reiterate that the standard for applying the Second Amendment is as follows:

> "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.
>
> The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"

*Bruen*, at 2126. ("In sum, the Courts of Appeals' second step is inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny.") (emphasis added) (citation omitted).

15.     "But to the extent that later history contradicts what the text says, the text controls." *Bruen*, at 2137.

---

[3] *McDonald v. Chicago*, 561 U.S. 742 (2010).
[4] "But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, at 2127. See also, *Caetano*, supra.

## MATERIAL FACTS

16.     The mere possession of a handgun in New York State is a felony punishable by incarceration, fines, and other penalties, and will cause the permanent loss of one's right to possess firearms.

17.     To lawfully purchase, possess, and/or carry a handgun in New York State requires applying for, and obtaining, a handgun license from a statutory licensing officer.

18.     The statutory licensing officer for the 5 boroughs of New York City is the New York City police commissioner[5], who delegates such authority to the NYPD License Division.[6]

19.     New York State's handgun regulations are set forth in Penal Law section 400.00, however, New York City has enacted its own rules and regulations under 38 RCNY 5 to restrict conduct protected by the Second and Fourteenth Amendments.

20.     38 RCNY 5 regulates, among other conduct, the handgun licensing process, restrictions on the purchase of handguns, the possession of handguns, and the concealed carriage of handguns.

21.     Before an individual may lawfully possess a handgun in New York City, they must create an online account through the NYPD License Division portal,[7] complete the application, which includes uploading documents to the portal[8], and submit the application by selecting the "Finalize and Submit" button. The applicant is eventually contacted for an appointment to personally appear at the License Division to be fingerprinted  and pay the required fees.

---

[5] Penal Law 265.00(17).
[6] https://www.nyc.gov/site/nypd/services/law-enforcement/permits-licenses-firearms.page
[7] https://licensing.nypdonline.org/app-instruction/
[8] https://licensing.nypdonline.org/new-app-instruction/

***Licensing Fees***

22.     The right to possess weapons in common use, which includes handguns, is a preexisting right; individuals inherently possess that natural right to instruments of self-defense just as they possess the right to speak, worship, and breathe.

23.     The right to possess and carry weapons is not 'given' to anyone, and existed long before the existence of any form of government.

24.     The Second Amendment merely codified a preexisting right[9] – for its protection against a tyrannical government seeking to disarm the population, as England did.

25.     Any requirement that an individual pay money to the government to exercise the constitutional right to self-defense is unconstitutional.

26.     The constitutional right to keep and bear arms is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees. *Bruen*, at 2156 quoting, *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 780 (2010) (plurality opinion).

27.     No other constitutional right requires prior permission for its exercise.

28.     No other constitutional right requires paying the government money before may be lawfully exercised.

29.     In New York City, individuals must pay $428.50 to apply for permission to exercise a *preexisting* right: a $340 application fee and an $88.50 fingerprinting fee.[10]

30.     A New York City handgun license is required to be renewed every three (3) years, which requires another $340 to be paid.

---

[9] *Heller*, at 592.
[10] https://licensing.nypdonline.org/new-app-instruction/

31.     Requiring that an individual pay a fee to the government before they can exercise the right to possess and/or carry weapons in common use is repugnant to the plain text of the Second Amendment and inconsistent with text, history, and tradition.

32.     New York City's licensing fee requirement should be preliminarily and permanently enjoined.

***Permission to Purchase Handguns - 38 RCNY 5-25(a)***

33.     Once (and if) a handgun license is issued, the City places a whole host of rules and restrictions on the "licensees," whose Second Amendment-protected conduct is now under the complete discretion, control, and authority of the License Division[11] by way of "Subchapter B: Licensee Responsibilities."

34.     38 RCNY 5-25(a) prohibits a licensee from purchasing a handgun without first seeking and obtaining permission from the NYPD by way of a "Handgun Purchase Authorization" form ("Authorization form").[12]

35.     38 RCNY 5-22(9) provides, a licensee "shall not purchase or replace a handgun prior to obtaining written permission from the Division Head, License Division (see Handgun Purchase Authorizations)."

36.     Under 38 RCNY 5-25(a) and (c), licensees must seek and obtain permission from the government before they may purchase/acquire an additional handgun.

37.     The government will grant or deny permission as it so determines.

38.     Before purchasing a new firearm, licensees must complete the License Division's 'Purchase Authorization Form' ("PA Form") and bring the form to their gun store of choice. After

---

[11] https://codelibrary.amlegal.com/codes/newyorkcity/latest/NYCrules/0-0-0-77275
[12] A requirement notwithstanding 5-25(d)(1), which mandates "all licensees shall utilize a safe when handguns are stored out of their possession at a premises."

purchasing a new firearm, the gun store will provide the licensee with a Bill of Sale and will input the NICS (National Instant Criminal Background Check) number on the PA Form.

39.     The licensee cannot take possession of his/her firearm upon payment to the gun store and passing a NICS background check.

40.     Instead, within 72 hours of the purchase, the licensee must email the License Division the following documents along with his/her request to add the newly purchased firearm:[13]

- Completed "Purchase Authorization Request Form";

- Receipt/Bill of Sale for the firearm purchased;

- A minimum of two (2) color photographs of the firearm that was purchased (the first photograph must display the entirety of the firearm with accurate color representation, and the second photograph must legibly capture the firearm's serial number);

- Proof of ownership of safe storage consisting of a Bill of Sale and two (2) color photos of the safe storage, depicting both the interior and exterior of the safe/container. Photos may not be stock images and must depict the entirety of the safe/container, not merely a portion thereof.

41.     Failure to return the documents within the specified time (72 hours) <u>shall</u> result in the suspension and/or revocation of the handgun license(s). 38 RCNY 5-25(c)(5).

42.     Once the above items are received by the License Division, and if the purchase is approved, an amended license reflecting the newly purchase firearm and a Purchase Authorization (pink slip) is mailed to the licensee via United States Postal Service (U.S.P.S.) to the mailing address on record with the License Division.

---

[13] And the text of 38 RCNY 5-25 requires, *inter alia*, in person inspection of the newly purchased firearm.

43.     The Purchase Authorization and amended license are required for a licensee to take possession of their previously purchased firearm from the gun store.

44.     The License Division asks licensees to allow fourteen (14) business days to receive the Purchase Authorization and amended license.

***Government Registration of Handguns***

45.     38 RCNY 5-22(8) provides that a licensee is only authorized to own the handgun(s) that are listed on (registered to) their license.

46.     Firearm registration requirements are inconsistent with the plain text of the Second Amendment, and this Nation's history and tradition of firearm regulation. There is no historical analogue for such restrictions.

***Government Restriction on Number of Handguns One May Own and/or Register on License***

47.     Through 38 RCNY 5-25(d) entitled "Number of Handguns Allowed on a Handgun License", the government controls the number of handguns a licensee has permission to own – and the City requires licensees to have separate licenses – and separate handguns listed thereon - for possessing in their residence and for carrying concealed in public.

48.     A licensee with both a premise license and a carry license cannot register the same handgun on both licenses.

49.     38 RCNY 5-25(d)(4) proscribes the number of handguns the government will allow to be registered on a particular handgun license: Concealed carry licenses are limited to two (2) handguns.[14] Residence licenses are limited to one (1)[15], unless and until the government gives permission to purchase another handgun, but permission will be granted only if the licensee can

---

[14] Section 5-25(d)(4)(i).
[15] Section 5-25(d)(4)(vi).

prove to the government's satisfaction "evidence of appropriate safeguarding" and if the licensee "establishes compliance with the mandatory waiting periods pursuant to subdivision (b) of § 10-302.1 of the Administrative Code and § 400.20 of the Penal Law."

50.     Permission and discretion are required for every purchase, disposition, and/or transfer of a handgun – even where the licensee seeks to transfer a handgun from one license to the other.

51.     Take for example a New York City resident and licensee who owns five (5) handguns. He is only allowed to 'register' two (2) of them to his carry license, with the make, model, serial number, and caliber of each handgun displayed on the back of such carry license. The remaining three (3) handguns are required to be 'registered' and displayed on the back of his residence (premises) license in a similar fashion.

52.     A licensee *is absolutely prohibited from* publicly carrying *any* of the three (3) lawfully owned handguns 'registered to' a residence (premises) license.  If that licensee publicly carries any one of the three 'home' handguns, he will be guilty of a Class A Misdemeanor under Penal Law § 400.00(15), (17), which is punishable by one (1) year in jail, 3 years of probationary supervision, and/or a fine of $1,000, and his license will be suspended and/or revoked.

53.     Under section 5-25(d)(4)(iv), which restricts the number of handguns on a residence license, a licensee may ask permission to have additional handguns for home protection, which "shall be reviewed on an individual basis."

54.     But under section 5-25(d)(4)(i), which restricts Carry and Special Carry licenses to two (2) handguns, the Division Head of the License Division "may, in their discretion [*further*] limit the number of handguns that appear on the carry handgun license." Meaning that the government has discretion to limit a carry licensee to one specifically registered handgun.

***Government Restriction on Number of Handguns Purchased Within 90 Days***

55.    If permission to purchase is granted to the licensee, and the licensee clears all the hurdles to obtaining such permission, the licensee is prohibited from purchasing more than one (1) firearm within a 90-day time period. See, NYC Admin. Code 10-302.1.

56.     NYC Admin. Code 10-302.1(a) prohibits gun shops from (i) transferring and/or selling a firearm to any individual who has received/purchased a firearm within the past 90-days and (ii) from transferring/selling more than one (1) firearm to any individual as part of the same transaction.

57.    Under NYC Admin. Code 10-302.1(b), licensees (i) cannot purchase more than one (1) firearm (handgun, rifle, or shotgun) as part of the same sales transaction; and (ii) cannot purchase more than one (1) firearm during a 90-day time period.

58.    Transferring one's handgun from a premise license to a carry license starts the 90-day clock running as well.

59.    The 90-day clock for handgun purchases and transfers is separate and apart from the 90-day clock for purchases and transfers of rifles and shotguns.

60.    Violations of the 90-day waiting period constitute misdemeanor crimes punishable by one (1) year in jail and a fine of up to $1,000[16], license revocation for the licensee and the gun shop, and the automatic forfeiture and destruction of the firearms involved.[17] No NYC gun store will violate the 90-day restriction.

61.    A licensee who violates this regulation is also guilty of a Class A Misdemeanor under Penal Law § 400.00(15), (17), which is punishable by one (1) year in jail, 3 years of probationary supervision, and/or a fine of $1,000, and license revocation.

---

[16] See, 10-310.
[17] See, 10-302.1(h)(i).

62.     NYC Admin. Code 10-302.1(f) exempts from the 90-day waiting period individuals who also happen to be employed as law enforcement officers and/or peace officers - who have no limitation on the number of handguns, rifles, and shotguns they can purchase, receive, and/or transfer[18] for their personal use.

### Government Restriction on Number of Handguns Carried – Backup Handgun Ban

63.     Section 5-22(a)(7) restricts licensees holding a "Carry" or "Special Carry" type license to carrying only one (1) handgun on their person at any time. A licensee who violates this regulation is guilty of a Class A Misdemeanor under Penal Law § 400.00(15), (17), which is punishable by one (1) year in jail, 3 years of probationary supervision, and/or a fine of $1,000, and his license will be suspended and/or revoked.

### Plaintiff Braden Holliday

64.     Braden Holliday, age 31, is an African American man and a resident of the Bronx. Mr. Holliday has no prohibitors to the possession of firearms and is one of "the People" for whom the Second Amendment was written.

65.     If Mr. Holliday applied to the NYPD License Division for a license to possess and/or carry firearms, he would be approved.

66.     Mr. Holliday attempted to obtain a handgun license by going onto the NYPD License Division website and reviewing the instructions for obtaining firearm licenses.

67.     But Mr. Holliday learned that the licensing fee would cost him over $400, he stopped the application process because applying would be futile.

---

[18] The statute also exempts, *inter alia*, motion picture, television and video production companies, public agencies "in furtherance of official business."

68.     Mr. Holliday cannot obtain a firearm license because he cannot afford the cost of the application and fingerprinting fees, nor can he afford the cost of renewing the license every three years.

69.     Defendant's fee requirement is an absolute bar to the exercise of Mr. Holliday's Second and Fourteenth Amendment rights.

70.     If there was no fee for a firearm license, Mr. Holliday would have already submitted his application and been granted a firearm license. [19]

71.     It is a violation of Mr. Holliday's Second and Fourteenth Amendment rights for the City to require him to pay a fee to exercise a preexisting constitutional right.

72.     Analogous to the Fourteenth Amendment violations resulting from state-imposed poll taxes [see, *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 666 (1966) (holding "a State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard")], imposing a fee to exercise the rights protected under the Second Amendment is patently unconstitutional and must also be enjoined.

73.     Notably, the *Harper* Court did not try to justify the *amount* of the fee, but the very fact that there was a fee in the first instance. See, *Harper*, at 668 ("We say the same whether the citizen, otherwise qualified to vote, has $1.50 in his pocket or nothing at all, pays the fee or fails to pay it. The principle that denies the State the right to dilute a citizen's vote on account of his economic status or other such factors by analogy bars a system which excludes those unable to pay a fee to vote or who fail to pay.").

---

[19] See, Penal Law § 400.00(14), which caps the licensing fee for every county except Nassau County and New York City at $10 and does not authorize any licensing officer to collect a fee for fingerprinting.

74.    Particularly troubling is the fact that the states' gun regulations were motivated by, and originated from, racial animus and were intended to prevent freed slaves from possessing firearms.

75.    Judge Kozinski observed in *Silveira v. Lockyer*, 328 F.3d 567, 568 (9th Cir. 2003) (Kozinski, dissenting from denial of rehearing en banc) our Nation's history reveals that "tyranny thrives best where government need not fear the wrath of an armed people:

> Disarmament was the tool of choice for subjugating both slaves and free blacks in the South. In Florida, patrols searched blacks' homes for weapons, confiscated those found and punished their owners without judicial process. See Robert J. Cottrol & Raymond T. Diamond, The Second Amendment: Toward an Afro–Americanist Reconsideration, 80 Geo. L.J. 309, 338 (1991). In the North, by contrast, blacks exercised their right to bear arms to defend against racial mob violence. *Id.* at 341–42.
>
> As Chief Justice Taney well appreciated, the institution of slavery required a class of people who lacked the means to resist. See *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1857) (finding black citizenship unthinkable because it would give blacks the right to "keep and carry arms ***wherever they went***"). A revolt by Nat Turner and a few dozen other armed blacks could be put down without much difficulty; one by four million armed blacks would have meant big trouble." (emphasis added).

76.    If the government requires individuals to seek permission before they can exercise a ***preexisting*** right – an oxymoron in itself – then  the government must bear the cost.

### *Plaintiff Charles Mills*

77.    Charles Mills is a resident of Queens County. Mr. Mills has no prohibitors to the possession of firearms and is one of "the People" for whom the Second Amendment was written.

78.    Mr. Mills holds two (2) separate New York City handgun licenses, as required by the City's regulations – one license that authorizes him to purchase, own, and possess handguns in

his home for protection ("Premise License"); and a second license that authorizes him to purchase, own, and carry a handgun concealed on his person ("Carry License").

79.     The application processing time for Mr. Mills to attain permission to obtain and possess handguns in his home (by way of a Premise License) was approximately 17 months.

80.     Mr. Mills also holds a New York City Rifle/Shotgun License.

81.     Every handgun that Mr. Mills owns is required to be registered to one of his licenses, and on the back of each license is listed those handguns that are registered thereto.

82.     Only two (2) of the handguns owned by Mr. Mills (and therefore registered to his Premise License) can be registered to his Carry License.

83.     Mr. Mills is prohibited from registering more than 2 handguns to his Carry License. And he may only carry those two (2) handguns in public.

84.     If Mr. Mills carries ANY of the other handguns registered to his Premise License, his license will be revoked, and he will be guilty of a Class A Misdemeanor as described above.

85.     Mr. Mills has tried to purchase/transfer/receive more than one firearm at a time but is prohibited by New York City's regulations from purchasing more than one firearm at a time. Every gun shop in New York City is statutorily prohibited from selling anyone, including Mr. Mills, more than one handgun at a time and every gun shop that Mr. Mills has spoken with complies with the 90-day restriction.

86.     When Mr. Mills was issued his Carry License, he attempted to transfer two (2) of the handguns registered to his Premise License onto his Carry License but was forced to add one and then wait 90 days to add the second.

87.     After adding the second handgun to his Carry License, Mr. Mills was forced to wait another 90 days to purchase a new handgun, which required a repeat of the same lengthy permission process.

88.     Mr. Mills has purchased handguns in the past and intends to purchase additional handguns in the future.

89.     Specifically, Mr. Mills has definite plans to purchase a Glock 21 from Woodhaven Rifle & Pistol and would already have purchased the handgun but is barred from purchasing it because (i) he was required to wait 90 days from the last time that he 'received' a handgun - when he transferred his Glock 19 from his Premise License to his Carry License; and (ii) until this week he has been unable to reach anyone in the License Division to obtain a Purchase Authorization Form, which are not available to download from the website.

90.     Under the City's regulations, the transfer of Mr. Mills' Glock 19 from his Premise License to his Carry License triggered the 90-day waiting period for any other transfers/purchases. On June 23, 2023, Mr. Mills was required to wait 6 more weeks to begin the purchase/permission process with the government, and he will be required to wait 90 more days after each future purchase.

91.     Even if Mr. Mills purchased a handgun outside of New York City from a gun store not bound by the City's 90-day restrictions, Mr. Mills would be guilty of a crime under New York City's regulations as detailed above, would be unable to register the new handgun on his licenses, and would have his handgun licenses revoked for failure to abide by the City's rules.

92.     Like just about every other handgun owner, Mr. Mills intends to decide for himself which of his handguns to carry on any particular day, and to then carry it for self-defense, and objects to being required to seek and obtain permission from a government employee.

93.     But Mr. Mills cannot make such use of his property because he is restricted to choosing from only two (2) handguns and is prohibited from carrying any of the remaining handguns on his Premise License.

94.     Mr. Mills also intends to carry one of his handguns as a primary weapon and a second handgun as a back-up.

95.     Mr. Mills is prohibited from carrying more than one handgun at a time under 38 RCNY 5-22(7). Violation of this regulation subjects Mr. Mills to criminal penalties, revocation of all three (3) of his licenses, and mandatory statutory forfeiture of his firearms.

96.     Mr. Mills would carry a backup handgun on a regular basis but for the fact that carrying more than one handgun at a time is a crime in New York City – even for licensees.

97.     The NYPD will arrest Mr. Mills for carrying more than one of the handguns registered to his Carry License at the same time, and the License Division will revoke Mr. Mills' Premise, Carry, and Rifle/Shotgun Licenses for violating the government's rules.

98.     The restrictions to Mr. Mills' exercise of the rights protected by the Second and Fourteenth Amendments described herein are repugnant to the plain text of the Second Amendment and should be permanently enjoined.

***Plaintiff Craig Sotomayor***

99.     Craig Sotomayor, age 23, is a Hispanic male and resident of Nassau County, which is located outside of New York City. Mr. Sotomayor has no prohibitors to the possession of firearms and is one of "the People" for whom the Second Amendment was written.

100.    Mr. Sotomayor holds an unrestricted (full carry) New York State concealed carry handgun license issued by the statutory licensing officer for Nassau County.

101.   Because NYS handgun licenses that are issued outside of the City are invalid inside of the City[20], Mr. Sotomayor was required to apply for and obtain a NYC Special Carry License, which he did.[21] Mr. Sotomayor also holds a NYC Rifle/Shotgun License.

102.   Mr. Sotomayor has an impressive and sizeable handgun collection of revolvers and semi-automatic pistols that vary in model type, caliber, and size. Each of his firearms is registered to his New York State license.

103.   Mr. Sotomayor carries a handgun on a regular basis for self-defense, and many times he carries a backup. Mr. Sotomayor's choice of which handgun(s) to wear depends on a number of factors, from size, caliber, weather, clothing, where he will be traveling to and the activities he will be engaged in.

104.   Under the City's restrictions, Mr. Sotomayor was forced to choose two handguns from his collection to register to his Special Carry License. Though vetted and licensed, if Mr. Sotomayor carries any of his lawfully owned handguns other than the two specifically registered to his Special Carry License, he will be guilty of a crime, arrested, incarcerated, prosecuted, his Special Carry License will be revoked, and he will be forced to forfeit not only the handgun he was wearing but also the two handguns on his Special Carry License, as detailed in the regulations above.

105.   Mr. Sotomayor has carried a backup handgun during his travels when outside of the City. In fact, Mr. Sotomayor purchased his Ruger LCP Max – a pocket-sized handgun – and a pocket holster specifically for that purpose.

---

[20] Penal Law § 400.00(6).
[21] Mr. Sotomayor also holds concealed carry licenses issued by the following states and jurisdictions: Arizona, Connecticut, Florida, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, Pennsylvania, Rhode Island, Utah, Virginia, Washington D.C., and West Virginia, which allows Mr. Sotomayor to lawfully carry a handgun in 44 states.

106.    In fact, the two handguns that Mr. Sotomayor chose to register to his NYC Special Carry License are a primary carry handgun and the Ruger LCP Max to carry as a backup.

107.    With the rise of violent criminal activity in the City, Mr. Sotomayor intends to carry a primary handgun and his Ruger LCP Max backup handgun when he travels to the City.

108.    The only reason Mr. Sotomayor cannot carry a backup handgun in New York City is the threat of being arrested and subject to criminal penalties, the revocation of his Special Carry License, and loss of his firearms. See, 38 RCNY 5-22(7).

109.    New York City prohibits regular citizens from carrying a backup handgun but places no limit on the number of handguns that an off-duty police officer can carry at one time.

110.    An August 2022 NYPD memorandum instructs all officers that:

> "Anyone carrying a firearm is presumed to be carrying unlawfully until proven otherwise."

> "Officers may stop an individual when the officer has reasonable suspicion that an individual is carrying a firearm…and may frisk that individual since the officer has reasonable suspicion that the individual is armed and dangerous."

111.    According to NYPD policy, exercising one's Second Amendment rights is a *de facto* waiver of one's Fourth Amendment rights and constitutionally protected conduct – carrying a firearm for self-defense - now gives the NYPD reasonable suspicion to believe an individual is 'dangerous' – with no exception for licensees.

112.    Any licensee who carries a handgun outside of his restrictions or in violation of any of the City's firearm regulations will be arrested and their handgun license will be revoked. Carrying outside of one's license restriction is a Class A Misdemeanor punishable by 1 year in jail, $1000 fine, and other civil and criminal penalties. See, Penal Law § 400.00(15).

113.   The regulations challenged herein are overbroad, vague, and otherwise violate Plaintiffs' constitutional rights by criminalizing conduct that is presumptively protected by the plain text of the Second Amendment and this Nation's historical traditions.

114.   New York City's regulations have caused Plaintiffs to suffer concrete and actual harm for violations of their presumptively guaranteed and preexisting right to possess and carry weapons in common use in case of confrontation, and Plaintiffs will continue to suffer such concrete harms until the challenged regulations are permanently enjoined and stricken as unconstitutional.

### COUNT I
### U.S. CONST., AMEND. II, XIV - 42 U.S.C. § 1983
### (SECOND AMENDMENT, FOURTEENTH AMENDMENT)

115.    Plaintiffs repeat and reallege paragraphs "1" through and including "114" as if fully repeated herein.

116.    Under the theory that Defendant is liable to Plaintiffs for violations of their rights as protected by the Second and Fourteenth Amendments to the United States Constitution. 42 U.S.C. § 1983.

### COUNT II
### (*Monell* Liability)

117.    Plaintiffs repeat and reallege paragraphs "1" through and including "116" as if fully repeated herein.

118.    Under the theory that New York City is liable for the violations of Plaintiffs' constitutional rights, which were caused by and resulted from the enforcement of New York City's customs, practices, policies, and regulations as set forth herein. *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

- A judicial declaration that requiring individuals to pay money to the government for permission to possess and carry firearms violates the Second and Fourteenth Amendments;

- In the alternative, a judicial declaration that the requirement that an applicant and/or licensee pay more than a nominal fee to apply for and/or renew a handgun license violates the Second and Fourteenth Amendments;

- A judicial declaration that 38 RCNY 5-22(a)(7), (8), (9), and (10) violate the Second and Fourteenth Amendments;

- A judicial declaration that the provision 38 RCNY 5-25 violates the Second and Fourteenth Amendments;

- A judicial declaration that NYC Administrative Code 10-302.1(a)-(e) violates the Second and Fourteenth Amendments;

- The permanent injunction of 38 RCNY 5-22(a)(7), (8), (9), (10), 38 RCNY 5-25, and NYC Administrative Code 10-302.1(a)-(e);

- Presumed nominal damages against Defendant for the constitutional violations alleged herein;

- Garden variety compensatory damages;

- Reasonable statutory attorney's fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable statute; and

- Such other further and alternative relief as the Court deems just and proper.

Dated: August 23, 2023
      Scarsdale, New York

                                    THE BELLANTONI LAW FIRM, PLLC
                                    *Attorneys for Plaintiffs*

By:          /s
                                    Amy L. Bellantoni (AB3061)
                                    2 Overhill Road, Suite 400
                                    Scarsdale, New York 10583
                                    (914) 367-0090 (t)
                                    (888) 763-9761 (f)
                                    abell@bellantoni-law.com