1:23-cv-07460-JSR

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ____________
DATE FILED: Nov 10 2026

24-3308
*Mills v. New York City*

# In the
# United States Court of Appeals
# for the Second Circuit

---

AUGUST TERM 2025

No. 24-3308-cv

CHARLES MILLS, CRAIG SOTOMAYOR, AND BRADEN HOLLIDAY,
*Plaintiffs-Appellants*,

v.

NEW YORK CITY, NEW YORK,
*Defendant-Appellee*.

---

On Appeal from the United States District Court
for the Southern District of New York

---

ARGUED: NOVEMBER 18, 2025

DECIDED: NOVEMBER 10, 2026

---

Before: RAGGI, LIVINGSTON, and PARK, *Circuit Judges*.

---

Plaintiffs appeal from a judgment entered in the United States District Court for the Southern District of New York (Rakoff, *J.*) dismissing their complaint raising Second Amendment challenges to various New York City rules governing the acquisition, sale, registration, and carry of handguns. Plaintiffs submit that the district court erred in dismissing the complaint (1) in part for failure plausibly to allege the injury-in-fact element of standing necessary for the exercise of subject

CERTIFIED COPY ISSUED ON 11/10/2026

matter jurisdiction, *see* Fed. R. Civ. P. 12(b)(1); and (2) in part for failure to state a claim for which relief can be granted based on a determination that the rules and regulations at issue did not regulate conduct covered by the plain language of the Second Amendment as necessary to satisfy the first step of analysis under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 20 (2022); *see* Fed. R. Civ. P. 12(b)(6).

We identify no error in the dismissal of certain claims for lack of jurisdiction. As to dismissal for failure to state a claim, plaintiffs' fees challenge was correctly dismissed in light of *Kwong v. Bloomberg*, 723 F.3d 160, 165–69 (2d Cir. 2013). Certain of plaintiffs' other claims, however, should not have been dismissed at step one of the *Bruen* analysis.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.

---

AMY L. BELLANTONI, The Bellantoni Law Firm, PLLC, Scarsdale, NY, *for Plaintiffs-Appellants*.

JEREMY W. SHWEDER, Assistant Corporation Counsel, *for* Muriel Goode-Trufant, Corporation Counsel of the City of New York, New York, NY (Richard Dearing, Devin Slack, Geoffrey E. Curfman, *on the brief*), *for Defendant-Appellee*.

Janet Carter, William J. Taylor, Jr., Priyanka Gupta Sen, Everytown Law, New York, NY, Sana S. Mesiya, Everytown Law, Washington, DC, *for* Amicus Curiae *Everytown for Gun Safety, in support of Defendant-Appellee*.

Paul D. Clement, Erin E. Murphy, Matthew D. Rowen, Kevin Wynosky, Clement & Murphy, PLLC, Alexandria,

VA, *for* Amicus Curiae *The National Shooting Sports Foundation, Inc., in support of Plaintiffs-Appellants*.

---

REENA RAGGI, *Circuit Judge*:

Plaintiffs are New York State residents who appeal from a judgment entered on December 5, 2024, in the United States District Court for the Southern District of New York (Jed S. Rakoff, *Judge*) dismissing their complaint raising Second Amendment challenges to certain New York City ("City") rules governing the acquisition, sale, registration, and carry of handguns. *See* U.S. Const. amend. II; *Mills v. New York City*, 758 F. Supp. 3d 250 (S.D.N.Y. 2024). Plaintiffs submit that insofar as the district court dismissed certain of their claims for lack of jurisdiction, *see* Fed. R. Civ. P. 12(b)(1), the court erred in concluding that they failed plausibly to allege the injury-in-fact necessary to satisfy the standing requirement for jurisdiction. Plaintiffs further submit that insofar as the district court dismissed other claims—whether considered as facial or as-applied challenges—for failure to state a claim for which relief can be granted, *see* Fed. R. Civ. P. 12(b)(6), the court erred in concluding that the challenged rules regulated conduct not covered by the plain language of the Second Amendment as necessary to satisfy the first step of analysis under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen* ("*Bruen*"), 597 U.S. 1, 20 (2022).

We identify no error in the dismissal of certain claims for lack of jurisdiction. As to those dismissed for failure to state a claim, plaintiffs' fees challenge was correctly dismissed in light of *Kwong v. Bloomberg*, 723 F.3d 160, 165–69 (2d Cir. 2013). Plaintiffs' other challenges—to rules (1) limiting to one the number of handguns that a person can carry at any particular time, (2) mandating a 90-day waiting period between handgun purchases, and (3) limiting to two the number

of handguns that a person can register on a carry license—should not have been dismissed at the first step of the *Bruen* analysis. At that step a court properly asks whether the activities being regulated fall within "the normal and ordinary meaning of the Second Amendment's language," *i.e.*, the right "to keep and bear Arms," *Bruen*, 597 U.S. at 20 (internal quotation marks omitted). Each of the activities at issue warrants an affirmative answer to that question. This is not to conclude that the challenged rules are necessarily unconstitutional. We hold simply that the constitutionality of these rules must be determined at the second step of the *Bruen* analysis, which requires the government to show that a challenged rule is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24.

Accordingly, we affirm the judgment in part, vacate the judgment in part, and remand for further proceedings consistent with this opinion.

## BACKGROUND

In recounting the background to this case, we follow the standard applicable to judicial review of motions to dismiss, *i.e.,* we accept all allegations in plaintiffs' complaint as true, and we consider those pleadings, as well as all matters of proper judicial notice and public record, in the light most favorable to plaintiffs. *See Melendez v. City of New York*, 16 F.4th 992, 996 (2d Cir. 2021).

### I. The Challenged Rules

The rules subject to Second Amendment challenge in this case are as follows:

(1) Authorization requirements for the lawful acquisition of a handgun. *See* 38 R.C.N.Y. §§ 5-22(a)(9), 5-25(a), (c).[1]

(2) A rule authorizing persons "to own only the handgun(s) that are listed on their license." *Id.* § 5-22(a)(8).[2]

(3) A rule authorizing at most two handguns to be listed on a carry license. *See id.* § 5-25(d)(4) (repealed 2024).[3]

(4) A rule limiting to one the number of handguns that licensees can "carr[y] on their person at any time." *Id.* § 5-22(a)(7).

(5) A rule limiting to one the number of handguns that licensees can purchase, acquire, or transfer within a 90-day period, and the reporting

[1] Former 38 R.C.N.Y. § 5-25(a)—in effect at the time plaintiffs initiated this action and recodified in 2024 as § 5-25(c)—required a person with a gun license to obtain "prior written authorization from the Division Head, License Division" to acquire a handgun. Section 5-22(a)(9) states that a "licensee shall not purchase or replace a handgun prior to obtaining" such authorization. Current § 5-25(a) states that a licensee "who acquire[s] and attempt[s] to register more than one (1) firearm in a ninety (90) day period, shall not be granted an authorization form to take possession of an additional firearm until the ninety (90) day period has elapsed."

[2] Title 38 R.C.N.Y. § 5-22(a)(8) requires a person to register every handgun that he owns on one of his licenses.

[3] Challenged § 5-25(d)(4)—in effect at the time plaintiffs initiated this action—permitted holders of carry licenses to register no more than two handguns to those licenses, with the Division Head of the License Division afforded discretion to "limit to one the number of handguns that appear on the carry handgun license when the licensee's needs do not require possession of two handguns." *See id.* § 5-25(d)(4)(i).

requirements imposed on firearms dealers to ensure compliance with that limitation. *See* N.Y.C. Admin. Code § 10-302.1(a)–(e).[4]

(6) Fees charged to apply for and to renew a handgun license. *See id.* § 10-131(a)(2).[5]

## II. Plaintiffs' Claims

Plaintiff Braden Holliday, a Bronx resident, alleges that he has been unable to obtain the licenses necessary for him to possess and carry a handgun in the City because he cannot afford to pay the mandatory $340 application fee and attendant $88.50 fingerprinting fee. Nor can he afford the $340 renewal fee that comes due every third year after licensing. He asserts that, but for these fees, he would have submitted a satisfactory application and been granted a handgun license.

Plaintiff Charles Mills, a Queens resident, holds two City handgun licenses, one allowing him to keep handguns in his home ("premises license"), the other

[4] N.Y.C. Admin Code § 10-302.1(a) imposes a 90-day waiting period on firearms dealers in selling or transferring a handgun to the same person. Section 10-302.1(b) imposes the same 90-day waiting period on a handgun customer. Sections 10-302.1(c)–(e) require dealers to ensure compliance with this limitation by contacting the police department or other relevant licensing authority prior to selling or transferring a handgun and by keeping records of "the efforts made by such dealer to ensure compliance with the requirements of this section, any exception or exemption set forth in this section that such dealer reasonably believes would authorize the disposal of such [handgun], and the grounds for such dealer's belief that such exception or exemption applies."

[5] N.Y. Penal Law § 400.00(14) authorizes the New York City Council to set handgun license fees. Since 2004, the fee to secure and (every three years) to renew such a license has been $340. N.Y.C. Admin. Code § 10-131(a)(2). License applicants must also pay for fingerprinting, for which the New York City Police Department charges a fee of $88.50. NYPD License Division, *New Application Instructions*, https://perma.cc/W56H-CAW5 (last visited Sep. 29, 2026). Elsewhere in New York State, other than Nassau and Westchester Counties, such license fees are capped at ten dollars. N.Y. Penal Law § 400.00(14).

allowing him to carry a concealed handgun on his person ("carry license"). Mills alleges that he has registered multiple handguns to his premises license. But, insofar as he can only carry a handgun registered to his carry license, *see* N.Y. Penal Law § 400.00(15) (making it Class A Misdemeanor to carry firearm not registered to carry license), Mills asserts that his right to bear arms is being unconstitutionally limited by City rules prohibiting him from registering more than two of his handguns to his carry license and from carrying more than one of these handguns on his person at a time. Mills submits that but for this regulatory scheme, he would register more of his handguns to his carry license and routinely carry a second, back-up handgun on his person for self-defense. He further asserts that but for the 90-day limitation on handgun acquisitions, he would have purchased a Glock handgun from a Queens gun shop within that time frame.

Plaintiff Craig Sotomayor, a resident of Nassau County, holds a New York State concealed carry handgun license as well as a City special license, the latter of which allows non-City residents such as himself with valid out-of-City carry licenses to carry handguns within the City. Like Mills, Sotomayor challenges City rules prohibiting him from registering more than two of his many handguns to his City special license and from carrying more than one handgun at a time for self-defense. He further challenges the 90-day limitation period for handgun acquisitions and the allegedly unduly burdensome prior-authorization process.

## III. Dismissal

Plaintiffs filed this action in the Southern District of New York on August 23, 2022. The City moved to dismiss all claims under either Federal Rule of Civil Procedure 12(b)(1) for lack of the standing necessary to support jurisdiction, or Rule 12(b)(6) for failure to state a claim for which relief can be granted. While the motion was pending, the Supreme Court decided *United States v. Rahimi*, 602 U.S. 680 (2024) (clarifying how *Bruen* test applies to regulations alleged to constrain

Second Amendment rights), prompting the district court to order further briefing. In its supplemental filing, the City advised that on August 12, 2024, the version of 38 R.C.N.Y. § 5-25 challenged by plaintiffs had been repealed and replaced with a new version that, *inter alia,* no longer strictly limits the number of handguns that can be registered to a carry license, *see id.* § 5-25(g)(3).

On December 5, 2024, the district court entered judgment granting the City's motion to dismiss plaintiffs' complaint in its entirety. As to the City's standing challenges, the district court found that plaintiffs failed to demonstrate the requisite injury-in-fact from certain handgun acquisition, registration, and disposal requirements and, accordingly, dismissed those claims for lack of jurisdiction. *See Mills v. New York City*, 758 F. Supp. 3d at 260–61. At the same time, the district court found that one or more plaintiffs had demonstrated standing to challenge the one-gun-carry rule, the 90-day rule for acquiring a further handgun, the repealed two-gun-carry-license rule (for purposes of retrospective damages), and fees charged to acquire and maintain a handgun license. *See id.* at 261–63. Nevertheless, it dismissed these claims for failure to state a claim for which relief can be granted, concluding, at the first step of the *Bruen* analysis, that the rules at issue did not regulate activity covered by the plain language of the Second Amendment. *See id.* at 263–68.

This timely appeal followed.

## DISCUSSION

We review *de novo* the grant of a motion to dismiss, whether for lack of jurisdiction or failure to state a claim. *See Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*, 156 F.4th 68, 75 (2d Cir. 2025) (Fed. R. Civ. P. 12(b)(6)), *petition for cert. filed*, No. 25-1070 (Mar. 11, 2026); *Bugliotti v. Rep. of Argentina*, 67 F.4th 102, 104 (2d Cir. 2023) (Fed. R. Civ. P. 12(b)(1)). As earlier noted, on such review, we accept all

factual allegations as true and draw all reasonable inferences from those facts in plaintiffs' favor. *See Melendez v. City of New York*, 16 F.4th at 996. Nevertheless, to survive a Rule 12(b)(6) motion to dismiss, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Further, when, as here, facial claims are asserted, plaintiffs must plausibly allege that the challenged rules are unconstitutional in all applications, making facial claims "the most difficult to mount successfully." *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015) (alteration accepted) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see also National Shooting Sports Found., Inc. v. James*, 144 F.4th 98, 107–08 (2d Cir. 2025) (defining burden of facial challenge at motion to dismiss stage), *cert. denied*, 146 S. Ct. 2724 (2026).

## I. Dismissal of Claims for Lack of Jurisdiction

Plaintiffs submit that the district court erred in dismissing their claims challenging the City's handgun acquisition and registration requirements for lack of jurisdiction.[6] We are not persuaded.

To present a "case" or "controversy" supporting the exercise of federal jurisdiction, U.S. Const. art. III, § 2, cl. 1, a plaintiff must demonstrate that he has *standing* to sue. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). Three elements constitute the "irreducible constitutional minimum" for Article III standing: (1) an injury in fact, *i.e.*, "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or

[6] Insofar as plaintiffs do not appeal the Rule 12(b)(1) dismissal of their claim challenging the City's handgun disposal requirements, we deem that argument abandoned and "decline to exercise our discretion" to review that claim further in this opinion. *United States v. Prawl*, 149 F.4th 176, 187 (2d Cir. 2025), *cert. denied*, 146 S. Ct. 1811 (2026).

hypothetical"; (2) a causal connection, *i.e.*, "the injury has to be fairly traceable to the challenged action of the defendant"; and (3) redressability, *i.e.*, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992) (citations and internal quotation marks omitted; alterations accepted); *accord Clapper v. Amnesty Int'l USA*, 568 U.S. at 408–09; *Coalition for Competitive Elec., Dynergy Inc. v. Zibelman*, 906 F.3d 41, 58 (2d Cir. 2018). In considering these requirements, a court is properly mindful that "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Applying these principles here, we identify no error in the district court's dismissal of certain claims for failure to demonstrate Article III standing.

### A. The Purchase-Authorization Rules

Insofar as plaintiffs challenge the rules requiring licensees to procure official authorization to purchase a handgun, *see* 38 R.C.N.Y. §§ 5-22(a)(9), 5-25(a), (c), the district court correctly determined that no plaintiff had alleged a cognizable injury traceable to those rules. While the rules impose an administrative obligation on licensees seeking to acquire a handgun, the obligation does not cause constitutional injury because the rules themselves mandate that the NYPD "*will provide* a handgun authorization form" to qualified licensees when requested. *Id.* § 5-25(c) (emphasis added). Neither Mills nor Sotomayor, each of whom possesses both premises and carry licenses, alleges that he was unable to purchase a handgun because of the purchase-authorization rules. Rather, as the district court noted, Mills alleges only that he was unable to purchase a handgun while authorization forms were temporarily unavailable on the NYPD website. Any injury from such delay, however, was caused by that administrative failure, not by the purchase-authorization rules themselves. Similarly, to the extent Holliday

alleges that he cannot obtain a handgun because of the high cost of the application fee—a point we discuss further *infra* at section II.F—that too is not an injury caused by the purchase-authorization rules. Thus, the district court correctly determined that plaintiffs failed to demonstrate standing to challenge the purchase-authorization rules and properly dismissed that claim for lack of jurisdiction.

### B. The Handgun-Registration Rule

In a related claim, plaintiffs challenge the requirement that a person authorized to acquire a handgun register that gun to a valid license before he takes possession of the weapon. *See* 38 R.C.N.Y. § 5-22(a)(8). As the district court observed, the challenge is pleaded in a cursory fashion, with no allegation of specific injury to any plaintiff's right to keep and bear arms. *See Mills v. New York City*, 758 F. Supp. 3d at 261. Because a "generalized grievance" is insufficient to demonstrate standing, *United States v. Hays*, 515 U.S. 737, 743 (1995), the district court correctly dismissed plaintiffs' handgun-registration-rule claim for failure to demonstrate the standing necessary for jurisdiction.

## II. Dismissal for Failure To State a Plausible Second Amendment Claim

The district court recognized, and the City does not dispute, plaintiffs' standing to challenge rules (1) limiting to one the number of handguns that a licensed person can carry at any particular time, (2) prohibiting the acquisition of more than one handgun during any 90-day period, (3) limiting to two the number of handguns that can be registered to a carry license, and (4) imposing fees to acquire and maintain a gun license. At issue on this appeal is the district court's dismissal of these challenges for failure to state a claim for which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).

We affirm the dismissal of plaintiffs' fees challenge, which is foreclosed by this court's decision in *Kwong v. Bloomberg*, 723 F.3d at 165–69, upholding the very

fees here at issue. As for the remaining claims, we conclude that they should not have been dismissed at step one of the *Bruen* analysis and, accordingly, we vacate the challenged judgment in that respect and remand to the district court for further consideration of these claims. To explain, we begin by summarizing relevant principles of Second Amendment analysis.

### A. *Bruen*'s Two-Step Analysis for Second Amendment Claims

The Second Amendment states that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has construed the Amendment to guarantee individuals the "right to possess and carry weapons in case of confrontation," *i.e.*, for potential self-defense, without regard to service in a militia. *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008); *see id.* at 579 (observing that Second Amendment codifies "individual," not "collective," right to keep and bear arms); *Bruen*, 597 U.S. at 8–10 (holding that Second Amendment affords individuals right to carry handguns for self-defense outside home, as well as to possess such weapons inside home); *accord United States v. Rahimi*, 602 U.S. at 690 (citing *Bruen* in reiterating that Second Amendment "right to keep and bear arms . . . secures for Americans a means of self-defense"). Further, the Court has recognized the Second Amendment to apply to the states through the Fourteenth Amendment. *See McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010).

Mindful that the right protected by the Second Amendment, like other constitutional rights, is "not unlimited," the Court has set forth a two-step framework for determining when government action infringes that right. *Bruen*, 597 U.S. at 21 (internal quotation marks omitted); *accord United States v. Hemani*, 608 U.S. 772, 780 (2026); *see New York State Firearms Ass'n v. James*, 157 F.4th 232, 244 (2d Cir. 2025). At the first step of the *Bruen* analysis, a court asks whether "the

Second Amendment's plain text"—*i.e.*, its acknowledgment of "the right of the people to keep and bear Arms"—"covers an individual's conduct" that the government proposes to regulate. *Bruen*, 597 U.S. at 24. If conduct is so covered, then it is "presumptively" protected, in which case a challenged rule is constitutional only if, at the second step of analysis, the government shows the rule to be "consistent with the Nation's historical tradition of firearm regulation." *Id.* As the Supreme Court recently stated in clarifying the two-step *Bruen* framework, "when the Government regulates arms-bearing *conduct*, . . . it bears the burden to justify its *regulation*." *United States v. Rahimi*, 602 U.S. at 691 (internal quotation marks omitted; emphasis added). In short, the focus of the *Bruen* step-one inquiry is on *what* is being regulated, to determine if it is conduct covered by the text of the Second Amendment. The focus of the *Bruen* step-two inquiry is on *how* and *why* a regulation operates, to determine its consistency with historic firearm regulation. *See Wolford v. Lopez*, 609 U.S. 185, 196–97 (2026); *see also id.* at 217–21 (Barrett, *J.*, concurring) (detailing "how" and "why" inquiry at *Bruen* step two); *United States v. Hemani*, 608 U.S. at 780. Because we here consider whether the district court correctly concluded that plaintiffs failed to state a claim at *Bruen* step one, we discuss that step further.

The Supreme Court has instructed that the first step of the *Bruen* analysis is essentially "textual," *i.e.*, focused on "the normal and ordinary meaning of the Second Amendment's language" pronouncing "the right of the people to keep and bear Arms." *Bruen*, 597 U.S. at 20 (internal quotation marks omitted). Nevertheless, mindful that the Second Amendment did not confer a new right but, rather, "codified a *pre-existing right*," one known at English law even before the Founding, the Supreme Court has approved looking to history and tradition in

determining the meaning of the text. *Id.* (emphasis in original).[7] Because the Court has itself already done so in construing many of the Second Amendment's key words, lower courts can simply follow those precedents. Thus, the Court has ruled that "the people" referred to in the Second Amendment means "all members of the political community," not some subset thereof, such that the referenced "right" is afforded to the people as "individual[s]," not "collective[ly]." *District of Columbia v. Heller*, 554 U.S. at 579–80 (rejecting argument that Second Amendment rights pertain only to militia service). As for the substance of the right, *i.e.*, "to keep and bear Arms," the Court has construed "Arms" to mean "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582. It has recognized "the most natural reading of 'keep Arms' in the Second Amendment [to be] to 'have weapons,'" in short, to possess them. *Id.* As for the word "bear," the Court has stated that it means simply to "carry." *Id.* at 584. Nevertheless, the Court has instructed that "[w]hen used with 'arms,'" the word "bear" is properly understood to "refer[] to carrying for a particular purpose—confrontation," *i.e.*, for self-defense. *Id.* "Putting all of these textual elements together," the Court has thus construed the text of the Second Amendment to "guarantee the individual right to possess and carry weapons in

[7] Looking to history and tradition at step one of *Bruen* should not be confused with doing so at step two. The former is done to construe constitutional *text* to determine whether it covers the conduct at issue; the latter is done to determine whether a challenged rule regulating that conduct can be located within "the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24; *see Wolford v. Lopez*, 609 U.S. at 210–12 (looking to historical tradition at time of enactment of both Second and Fourteenth Amendments when considering challenge to state rule); *see also id.* at 213–14 (Barrett, *J.*, concurring) (observing that history plays different role at two steps of *Bruen* analysis, at first step to elucidate how contemporaries understood phrase "keep and bear Arms," and at second step to identify historical laws that pursued analogous goal in analogous way).

case of confrontation." *Id.* at 592. Thus, at the first step of the *Bruen* analysis, the proper inquiry is (1) "does the law apply to 'the people'—which is to say, all members of the political community"; (2) "does it concern any form of 'Arms,' *i.e.*, any weapon customarily used for offensive or defensive purposes"; and (3) "does the law place any restrictions on either the 'keep[ing]' (*i.e.*, possession) or the 'bear[ing]' (*i.e.*, carrying) of arms?" *Wolford v. Lopez*, 609 U.S. at 195 (brackets in original; some internal quotation marks omitted). If the answer to these questions is "yes," then the Second Amendment covers the conduct being regulated, and a presumption of unconstitutionality arises without regard to the regulation's scope, prevalence, or rationale. Those matters are properly considered as relevant to a historical tradition assessment at step two of the *Bruen* analysis. *See Bruen*, 597 U.S. at 24; *accord Wolford v. Lopez*, 609 U.S. at 195.[8]

In defending the dismissal of some claims pursuant to Rule 12(b)(6), the City does not dispute that plaintiffs are among "the people" referenced in the Second Amendment or that the conduct being regulated concerns arms, specifically, handguns, which the Supreme Court has recognized as "the quintessential self-defense weapon" in common use. *Bruen*, 597 U.S. at 47 (quoting *District of*

---

[8] The trio of questions identified in *Wolford* as pertinent to *Bruen* step one analysis now supplants those articulated by this court in *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1900 (2025), *i.e.*, (1) "whether the conduct at issue is protected" by the normal and ordinary meaning of the text of the Second Amendment as construed by the Supreme Court; (2) whether the weapon concerned is "in common use" for self-defense; and (3) "whether the affected individuals are 'ordinary, law-abiding, adult citizens' and thus 'part of "the people" whom the Second Amendment protects,'" *id.* at 982 (quoting *Bruen*, 597 U.S. at 31–32). To the extent the district court thought a more searching inquiry was necessary lest *Bruen* step one be satisfied "whenever a regulation has the slightest *connection* to guns," *Mills v. New York City*, 758 F. Supp. 3d at 264 (emphasis added), we understand *Wolford* to require some restriction on conduct protected by constitutional text, not merely a connection. In any event, we are bound by the Supreme Court's clarification of the appropriate inquiry at *Bruen* step one.

*Columbia v. Heller*, 554 U.S. at 629). Thus, the only *Wolford* question requiring consideration at step one of the *Bruen* analysis is whether the rules pertain to the "'keep[ing]' (*i.e.*, possession) or 'bear[ing]' (*i.e.*, carrying) of arms." *Wolford v. Lopez*, 609 U.S. at 195.

We note one caveat. As this court has recognized, Second Amendment protection can extend to conduct "ancillary" to the actual possession and carry of firearms—*e.g.*, the acquisition of such weapons or of the ammunition necessary to use them for self-defense. That is because, as this court has observed, "to 'keep' and 'bear' arms, one must also be able to acquire them and maintain them in operable condition." *United States v. Vereen*, 152 F.4th 89, 95 (2d Cir. 2025), *cert. denied*, 146 S. Ct. 1519 (2026); *see also Gazzola v. Hochul*, 88 F.4th 186, 196 (2d Cir. 2023) ("The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair." (quoting *Andrews v. State*, 50 Tenn. (3 Heisk.) 165, 178 (1871))). Nevertheless, mindful that the same conclusion does not apply to all ancillary conduct, we have held the Second Amendment to cover such conduct "only . . . to the extent that it is necessary to the realization of the textually specified right to keep and bear arms." *New York State Firearms Ass'n v. James*, 157 F.4th at 244 (internal quotation marks omitted; alteration accepted). Thus, we have held that a challenged rule pertaining to ancillary conduct will be deemed covered by the plain language of the Second Amendment at step one of the *Bruen* analysis if it "meaningfully constrain[s]" an individual's ability to possess and carry firearms. *United States v. Vereen*, 152 F.4th at 95 (holding that criminal prohibition on transportation of firearm into state of residence from outside state did not "*meaningfully constrain* the right to possess and carry arms" because person could still acquire firearm (presumably more easily) in home state (emphasis in original)). But where a challenged rule proposes to regulate, not ancillary conduct, but the actual keeping or bearing of arms, step one is satisfied

without regard to the degree of constraint, and infringement is presumed unless the government carries its burden at *Bruen* step two. To conclude otherwise would be to import into *Bruen*'s step-one inquiry the very "means-end" test that the Supreme Court there specifically rejected. *Bruen*, 597 U.S. at 18–19 (rejecting inquiry focused on "how close [challenged] law comes to the core" of Second Amendment rights as compared to "severity of the law's burden" on those rights).

Mindful of these precedents, we conclude that, with the exception of those pertaining to fees, *see infra* at section II.F, plaintiffs' claims should not have been dismissed under Rule 12(b)(6) at step one of the *Bruen* analysis.

### B. General Errors

At the outset, we note two errors that appear generally to have informed the Rule 12(b)(6) dismissal of plaintiffs' claims.

#### 1. The Second Amendment Does Not Protect Against Only Permanent Infringement of the Right To Keep and Bear Arms

Before undertaking *Bruen* step-one analysis of plaintiffs' specific challenges, the district court distinguished this case from those in which the Supreme Court recently discussed the right to keep and bear arms on the ground that none of the rules here at issue "operates to permanently deprive applicants of their right to own and carry firearms." *Mills v. New York City*, 758 F. Supp. 3d at 264 (collecting cases from *Heller* to *Rahimi*). To the extent this suggests that the Second Amendment protects against only permanent or complete deprivations of the right to keep and bear arms, that is mistaken.

To explain, as indicated *supra* at 13–15, the focus of the step-one inquiry is on *what* is being regulated. If the conduct at issue is covered by the plain text of the Second Amendment, *how* the challenged rule regulates that conduct—*e.g.*, whether permanently or temporarily—is a matter for consideration at step two of

the *Bruen* analysis by reference to the Nation's historical tradition of firearm regulation, *i.e.*, whether tradition supports regulation to the degree at issue. *See Bruen*, 597 U.S. at 19–20.

Certainly, none of the Supreme Court cases cited by the district court references the permanent/temporary distinction drawn by the district court, much less does any do so in identifying conduct covered by the Second Amendment. Rather, the Supreme Court having identified the *Bruen* step-one analysis as textual, it has rejected atextual distinctions in identifying what conduct is covered by the Second Amendment. Thus, just as the Court has observed that "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms," *Bruen*, 597 U.S. at 32, we are obliged to recognize that nothing in the text draws a temporary/permanent distinction with respect to the right to keep and bear arms. Further, to the extent history and tradition can inform text, *see supra* at 13–14 & n.7, the district court did not cite, and the City does not point, to anything supporting a conclusion that the right to keep and bear arms was historically understood to protect against only permanent, not temporary, deprivations of the right.[9] As the Supreme Court has observed, history and tradition show that the right to keep and bear arms, particularly in public, has been "subject to well-defined restrictions governing the *intent* for which one could carry arms, the *manner* of carry, or the *exceptional circumstances* under which one could not carry arms." *Id.* at 38 (emphasis added). But whether modern

[9] *See Bruen,* 597 U.S. at 24–25 (drawing analogy to First Amendment, where government bears burden to show that regulated expressive conduct "belongs to a historic and traditional category of constitutionally unprotected speech" (internal quotation marks omitted; alteration accepted)). After *Heller* and before *Bruen*, several of our sister circuits placed a similar burden on the government at the first step of the then-operative test. While *Bruen* rejected the second, means-end step of that test, the Court deemed the first step "broadly consistent with *Heller*." *Bruen*, 597 U.S. at 18–19.

regulations are analogous to such traditional restrictions is a question on which the government bears the burden at step two of the *Bruen* analysis regardless of whether the challenged limitation effects a permanent or temporary deprivation of the right.

No different conclusion about what is covered by the "right of the people to keep and bear arms" can be drawn from the fact that what the Amendment prescribes is that such right "shall not be *infringed*." U.S. Const. amend. II (emphasis added). The two-step inquiry established by *Bruen* suggests that "infringement," *i.e.*, a constitutional violation of the Second Amendment, is properly identified at the conclusion of both steps. *See supra* at 16–17. But neither the presumption of infringement that can arise at step one, nor the conclusive identification of infringement that can be made at step two depend on a *complete* deprivation of the people's right to keep or bear arms. At the time the Second Amendment was adopted, the word "infringe" was understood to mean "to violate," "to destroy," or "to hinder," SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (9th ed. 1790), also "to violate, break, transgress," NOAH WEBSTER, A COMPENDIOUS DICTIONARY OF THE ENGLISH LANGUAGE (1806), or to "destroy or hinder," NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828).[10] These definitions make clear that permanent or complete deprivations of a right certainly constitute "infringement," but they do not limit the word to such circumstances. "Infringe" also reaches temporary or partial deprivations. *See, e.g.*, SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (9th ed. 1790) (defining "hinder" as "[t]o obstruct; to stop; to impede"); NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (defining "hinder" as "[t]o stop; to interrupt; to obstruct; to impede or prevent

[10] The City points us to no different definitions from the time of the adoption of the Fourteenth Amendment.

from moving forward by any means"). Indeed, writings contemporary to the Founding demonstrate particular concern with rights being infringed incrementally or by degree, even when not permanently or completely destroyed.[11]

Finally, construing the Second Amendment to protect against only permanent deprivations of the right to keep and bear arms would be at odds with how the Supreme Court has construed other constitutional rights. In the First Amendment context, the Court has stated that "we must be as vigilant against the modest diminution of speech as we are against its sweeping restriction." *Federal Election Comm'n v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 264–65 (1986); *see Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (recognizing temporary occupancy restrictions on houses of worship during COVID-19 pandemic to effect a "loss of First Amendment freedoms"). And in the Fourth Amendment context, the Court has recognized that "[t]emporary detention of individuals . . . even if only for a brief period and for a limited purpose, constitutes

[11] *See, e.g.*, "Philanthropos," *Virginia Journal* (Dec. 6, 1787) ("[W]ill any man in his sober senses, say, that the least infringement, or appearance of infringement of our liberty . . . ought not to rouse our fears and awaken our jealousy?"), *reprinted in* 8 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 209 (1988), *quoted in* Daniel D. Slate, *Infringed*, 3 J. Am. Const. Hist. 381, 430 (2025); JOSEPH GALES, 1 ANNALS OF CONGRESS: THE DEBATES AND PROCEEDINGS IN THE CONGRESS OF THE UNITED STATES 451 (1834) (quoting Madison's fourth proposal for amendments to Constitution: "The civil rights of none shall be abridged on account of religious belief or worship, nor shall any national religion be established, nor shall the full and equal rights of conscience be in any manner, or on any pretext infringed."), quoted in Slate, *Infringed*, 3 J. Am. Const. Hist. at 430; *see also id.* at 412 (explaining that Blackstone discussed infringement of rights as both "incremental ('in any degree')" or "total"); *id.* at 441 (concluding that "at the Founding . . . 'shall not be infringed' [could] signify both (1) that a right shall not be violated so completely as to be destroyed and (2) that a right shall not be partially restricted through illegitimate process" as, for example, when "it collides against a higher or fundamental law (typically . . . expressed in the text of a written constitution)").

a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]," requiring the government to show it was not "unreasonable" under the circumstances. *Whren v. United States*, 517 U.S. 806, 809–10 (1996).

Thus, at the outset, we reject any suggestion that only permanent or complete deprivations of the right to keep and bear arms implicate conduct covered by the Second Amendment.

### 2. Step One of the *Bruen* Analysis Does Not Place a Burden on Plaintiffs To Show that Challenged Rules Are Foreclosed by the Second Amendment

"[T]urning to step one" of the *Bruen* analysis, the district court rejected plaintiffs' argument that because the "challenged regulations all impact and implicate their right to keep and bear firearms," (*Bruen* step one), it was the City's burden "to show that these challenged regulations are consistent with the Nation's historical tradition of firearm regulation" (*Bruen* step two). *Mills v. New York City*, 758 F. Supp. 3d at 264 (internal quotation marks omitted). Observing that the "specific right" protected by the Second Amendment is "to possess and carry weapons in case of confrontation," and that the right "has been recognized to coexist with ubiquitous local and state licensing regulations," *id.* at 264–65 (internal quotation marks omitted) (collecting cases rejecting Second Amendment challenges to certain licensing regimes), the district court dismissed plaintiffs' claims because "plaintiffs have failed to show that the challenged regulations are foreclosed by the text of the Second Amendment," *id.* at 265. This misstates plaintiffs' burden at the first step of the *Bruen* analysis, which requires only a plausible pleading that challenged rules target (or materially constrain) conduct covered by the plain text of the Second Amendment as construed by the Supreme Court. *See Wolford v. Lopez*, 609 U.S. at 195; *Bell Atl. Corp. v. Twombly*, 550 U.S. at 570. The constitutionality of rules regulating such conduct—however

ubiquitous—is a second-step inquiry on which the defendant bears the burden. *See Wolford v. Lopez*, 609 U.S. at 213 (Barrett, *J.*, concurring) ("We save 'historical gun regulations' . . . for *Bruen*'s second step.").

The district court's observation that the Second Amendment has been recognized to coexist with ubiquitous licensing regulations derives from a footnote in *Bruen* stating that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which a general desire for self-defense is sufficient to obtain a permit." 597 U.S. at 38 n.9 (internal quotation marks omitted; alterations accepted). The rules here at issue—limiting the number of guns a person can carry on his person, purchase within a 90-day period, or register to a carry license—are not akin to the shall-issue licensing regimes referenced in this footnote. In any event, that footnote is located in the part of *Bruen*'s text discussing the second step of analysis, not the first. *See id.* at 38–39 (beginning paragraph by "turn[ing] to respondents' historical evidence," and closing with conclusion that government respondents there "failed to meet their burden to identify an American tradition justifying New York's proper-cause requirement"). Thus, we understand the footnote to signal that the Court's invalidation of the challenged special-needs licensing requirement at step two of the *Bruen* analysis in that case should not be understood to suggest that all licensing regimes—particularly ubiquitous, non-discriminatory, objective shall-issue regimes—will necessarily fail the step-two analysis. *Id.* at 38 n.9. We do not understand the footnote to address the first step of the *Bruen* analysis at all.

No different conclusion obtains even if we were to read *Bruen* footnote nine further to suggest the presumptive validity of shall-issue licensing regimes. That

is because any such presumption would operate at *Bruen* step two.[12] The footnote still would not support assigning an added burden to plaintiffs at *Bruen* step one to show that "challenged regulations are foreclosed by the text of the Second Amendment." *Mills v. New York City*, 758 F. Supp. 3d at 265.

In assigning that step-one burden to plaintiffs here, the district court cited to *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211 (4th Cir. 2024) (*en banc*) (upholding summary judgment in favor of defendants on Second Amendment challenge to handgun-qualification-license statute), *cert. denied*, 145 S. Ct. 1049 (2025). There, the Fourth Circuit—writing without the benefit of the Supreme Court's recent clarification of the limited scope of the step-one inquiry, *see Wolford v. Lopez*, 609 U.S. at 195 (identifying three-prong inquiry)—pointed to *Bruen*

---

[12] *Bruen* footnote nine ends with a caveat. *See id.* (refusing to rule out all constitutional challenges to shall-issue licensing schemes, recognizing possibility of them being "put toward abusive ends" through "lengthy" processing times and "exorbitant fees" that effectively "deny ordinary citizens their right to public carry"). This signals caution in extending a presumption of constitutionality to all shall-issue regimes as distinct from "presumptively lawful regulatory measures," such as the "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools or government buildings, or laws imposing conditions and qualifications on the commercial sale of arms," identified in *District of Columbia v. Heller*, 554 U.S. at 626–27 & n.26. In any event, these prohibitions are typically presumed lawful at step two of the *Bruen* analysis rather than step one. *See, e.g.*, *Zherka v. Bondi*, 140 F.4th 68, 76–77 (2d Cir. 2025) (holding at *Bruen* step one that felons are among "the people" protected by the Second Amendment, and at step two, that historical tradition supports the constitutionality of disarmament of nonviolent felons); *see also Antonyuk v. James*, 120 F.4th at 983–85 (observing facial challenge to good-moral-character licensing unlikely to succeed in light of "widespread agreement" that restrictions "forbidding dangerous individuals from carrying guns comport with this Nation's tradition of firearm regulation" (internal quotation marks omitted)). Thus, however much such regulations' longstanding acceptance may lighten the government's burden to justify a challenged rule at step two, that does not narrow protected conduct at step one.

footnote nine in concluding that "non-discretionary 'shall-issue' licensing laws are presumptively constitutional and generally do not 'infringe' the Second Amendment right to keep and bear arms *under step one of the Bruen framework*." *Id.* at 222 (emphasis added). The court expanded on that conclusion to hold that "[a]mong other plain-text requirements," at *Bruen* step one, "a regulation falls within the ambit of the Second Amendment only if the regulation 'infringes' the Second Amendment right to keep and bear arms"; that it is a plaintiff's "burden" to demonstrate such infringement; and that the plaintiffs' failure to carry that burden in the case at issue defeated their facial challenge to the licensing regime "at step one of the *Bruen* framework." *Id.* at 220, 229; *see also United States v. Berger*, 189 F.4th 333, 339–40 (3d Cir. 2026) (construing endorsement of shall-issue licensing regimes in *Bruen* footnote nine as "gloss[] on the meaning of infringement at step one" (internal quotation marks omitted; alteration accepted)).

We respectfully decline to impose a similar burden on plaintiffs at *Bruen* step one because, for reasons already stated, we understand *Bruen* footnote nine to pertain to the step-two analysis of a challenged regulation, not to the step-one analysis of whether the conduct being regulated is covered by the plain text of the Second Amendment. To the extent this court has cited approvingly to the Fourth Circuit's recognition of any presumptions of validity in *Maryland Shall Issue, Inc.*, we have done so in applying such a presumption at step two of the *Bruen* analysis, *see Antonyuk v. James*, 120 F.4th at 982–88 & n.32, particularly when a plaintiff moves for a preliminary injunction, *see Giambalvo v. Suffolk Cnty.*, 155 F.4th 163, 181 (2d Cir. 2025) (requiring plaintiff moving to enjoin presumptively valid firearms training mandate to "make at least *some* showing to overcome this presumptive constitutionality as part of their burden of establishing a clear or substantial likelihood of success on the merits" (emphasis in original; internal quotation marks omitted)); *Frey v. City of New York*, 157 F.4th 118, 140 (2d Cir. 2025) (same for plaintiff moving to enjoin presumptively valid permitting requirement). A

plaintiff bears no such burden at *Bruen* step one in defending against dismissal. *See generally New Hope Family Servs. v. Poole*, 966 F.3d 145, 181 (2d Cir. 2020) (distinguishing plaintiff's burden as between own motion for preliminary injunction and defendant's motion to dismiss).

Further, nothing in *Bruen* footnote nine suggests that plaintiffs' step-one burden requires them to show that the challenged rules are foreclosed by the Second Amendment's text. Rather, the appropriate inquiry at step one is whether "any restrictions" are being placed on *conduct* covered by the plain text of the Second Amendment right to keep and bear arms. *Wolford v. Lopez*, 609 U.S. at 195. If the answer is "yes," infringement is presumed unless, at *Bruen* step two, the government shows that the challenged *rule* is consistent with the Nation's historical tradition of firearms regulation, in which case the presumption is defeated and the restriction does not result in unconstitutional infringement.[13]

---

[13] Concurring and dissenting judges in *Maryland Shall Issue, Inc.* expressed similar concerns about the reasoning leading the majority to recast the *Bruen* test:

> [T]he majority now makes infringement part of the showing that must be made at step one. Doing so, however, sets the *Bruen* test on its head. Rather than requiring the plaintiff to prove infringement at step one, as the majority does, *Bruen* requires the plaintiff to show only that his or her *conduct* is covered by the Amendment's plain text. . . . [T]he majority's newly created test is also circular and begs the question, . . . [requiring] plaintiff [to] prove that the regulation 'infringes' before the government is required to demonstrate the permissibility of the regulation by reference to historical tradition. Yet, *Bruen* makes clear that it is *only* after *both* steps are taken that infringement can be found.

*Id.* at 238 (Niemeyer, *J.*, concurring in part, dissenting in part, and concurring in the judgment) (emphasis in original); *see also id.* at 245 (Richardson, *J.*, dissenting) ("*Bruen* did not instruct courts to consider how significantly a regulation burdens protected conduct at the plain-text stage. And it certainly did not tie Footnote Nine to the plain-text meaning of 'infringe.'").

In sum, we conclude that, in dismissing plaintiffs' facial challenges at step one of the *Bruen* analysis, the district court erred in assigning plaintiffs the burden "to show that the challenged regulations are foreclosed by the text of the Second Amendment." *Mills v. New York City*, 758 F. Supp. 3d at 265. At *Bruen* step one, plaintiffs were required plausibly to allege only that the challenged rules effected any restriction (or material constraint) on conduct covered by the Second Amendment. We now consider whether dismissal was warranted at step one under this standard.

**C. One Handgun Carry Rule**

Title 38 R.C.N.Y. § 5-22(a)(7) prohibits a licensed individual from carrying more than one registered handgun on his person at any given time. The district court dismissed plaintiffs' facial and as-applied challenges to this regulation finding that its prohibition does not run afoul of the plain text of the Second Amendment because licensees can still defend themselves by carrying a single handgun. *See Mills v. New York City*, 758 F. Supp. 3d at 266–67. This was error. The conduct restricted by this rule—an individual's ability to carry more than one handgun for self-defense—falls squarely within the Second Amendment right of the people to "bear Arms."

As the Supreme Court has observed, self-defense is the "*central component*" of the right protected by the Second Amendment. *Bruen*, 597 U.S. at 29; *see District of Columbia v. Heller*, 554 U.S. at 628 ("[T]he inherent right of self-defense has been central to the Second Amendment right."). This, however, does not support construing the constitutional "right to keep and bear Arms" at step one of the *Bruen* analysis to cover the possession or carry only of the minimum weaponry deemed necessary for self-defense. In concluding that a handgun ban threatening less than "total disarmament" nevertheless violated the Second Amendment, the Court of Appeals for the District of Columbia Circuit observed that such reasoning

could support an argument "that all firearms may be banned" as long as other defensive weapons—knives, swords, etc.—are allowed. *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007), *aff'd sub nom.*, *District of Columbia v. Heller*, 554 U.S. 570.

Further, while the Supreme Court has construed the "keep and bear Arms" language of the Second Amendment to afford an individual right with respect to weapons commonly used for self-defense, *see generally District of Columbia v. Heller*, 554 U.S. at 595, it has not construed the plural word "Arms" to safeguard an individual right to possess or carry only a single such weapon. While not directly addressing the possibility of numerical limits, the Supreme Court has repeatedly used the plural form in describing the protected right. *See, e.g.*, *id.* at 592 (stating that "textual elements" of Second Amendment, "together . . . guarantee the individual right to possess and carry *weapons* in case of confrontation" (emphasis added)); *accord Bruen*, 597 U.S. at 17 (observing that Second Amendment "protect[s] . . . right to keep and bear *arms* for self-defense" (emphasis added)); *id.* at 20 (stating that "'normal and ordinary' meaning of the Second Amendment's language . . . 'guarantee[s] the individual right to possess and carry *weapons* in case of confrontation'" (emphasis added) (quoting *District of Columbia v. Heller*, 554 U.S. at 576–77, 592)). This court has described these precedents as construing the Second Amendment to codify "a pre-existing individual right to keep and bear *arms* for self-defense in case of confrontation." *Antonyuk v. James*, 120 F.4th at 961 (emphasis added).[14]

[14] Thus, we do not construe the Court's occasional use of the singular to suggest any numerical determination on the conduct protected at *Bruen* step one. *See, e.g.*, *District of Columbia v. Heller*, 554 U.S. at 577 (discussing "individual right to possess a firearm unconnected with service in a militia").

That understanding of an individual's constitutional right to "keep and bear *Arms*"—not "an Arm"—finds support in decisions of sister circuits recognizing the Second Amendment to safeguard the possession of multiple guns. *See Nguyen v. Bonta*, 140 F.4th 1237, 1242 (9th Cir. 2025) (holding that right to "keep and bear *Arms*" is "stated in the plural," and thus "protects the right to possess multiple firearms" (emphasis in original)); *Heller v. District of Columbia*, 801 F.3d 264, 280 (D.C. Cir. 2015) (holding temporal limitations on number of guns that could be possessed in home or registered interfered with "individual's undoubted constitutional right to keep arms (plural) in his or her home"). Just as the plain language of the Second Amendment affords a right to "keep . . . Arms" in the plural, so it affords a right to "bear Arms" in the plural.

In urging otherwise, the City submits that, at the time of adoption, the Second Amendment would not have been understood to contemplate the carrying of multiple firearms at one time because "all small arms [were then] single-shot weapons, requiring reloading by hand after every shot." Appellee Br. at 34 (quoting *District of Columbia v. Heller*, 554 U.S. at 686 (Breyer, *J.*, dissenting)). The premise does not ineluctably support the conclusion. The need for reloading after every shot might have made it more likely that an 18th-century individual would carry multiple firearms—or, certainly, multiple weapons—of the sort then commonly used for self-defense. In any event, the point is relevant at step two of the *Bruen* analysis, not step one. *See Bruen*, 597 U.S. at 26 (stating that whether challenged regulation addresses general societal problem "that has persisted since the 18th century" is relevant to historical inquiry at step two).

The Supreme Court having recognized modern handguns as the "quintessential self-defense weapon" now in use, *District of Columbia v. Heller*, 554 U.S. at 629, we conclude that, at step one of the *Bruen* analysis, numerical limitations on the carrying of such weapons must be recognized to regulate

conduct covered by the ordinary and plain meaning of the Second Amendment "right to keep and bear *Arms*."

This is not to suggest that numerical limitations on guns carried for defensive purposes are necessarily unconstitutional. Rather, we conclude that the constitutionality of such limitations is properly determined at step two of the *Bruen* analysis, where the government bears the burden of showing that the restrictions imposed are consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19. We do not here predict whether or how the government might carry that burden. *See generally id.* at 38 (acknowledging that right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms); *cf. id.* at 50 (holding that statutory tradition prohibiting bearing arms in "way that spreads 'fear' or 'terror' among the people" did not support "broad prohibitions on all forms of public carry"). We hold only that neither plaintiffs' facial nor as-applied challenge to a one-gun carry limitation should have been dismissed at *Bruen* step one.

**D. 90-Day Waiting Period**

Our conclusion that the plain language of the Second Amendment codifies a right "to keep and bear Arms" in the plural compels us also to conclude that rules designed and intended to slow the acquisition of multiple weapons, though ancillary to the right to keep and bear arms, "meaningfully constrain" exercise of the right so as to satisfy step one of the *Bruen* analysis. *United States v. Vereen*, 152

F.4th at 94. That is the case with the challenged 90-day-waiting-period rules. *See* N.Y.C. Admin. Code § 10-302.1(a), (b).[15]

To the extent this waiting period might be characterized as a "condition," and not a bar, "on the commercial sale of arms," so as to claim presumptive constitutionality, *District of Columbia v. Heller*, 554 U.S. at 626–27 & n.26; *accord McDonald v. City of Chicago*, 561 U.S. at 786 (plurality opinion) (reiterating *Heller*'s "assurance" as to presumptive constitutionality of "laws imposing conditions and qualifications on the commercial sale of arms"), the argument fails. As this court has recognized, such a "presumption of legality can be overcome" where purchase conditions are "so restrictive" that they threaten the "right to acquire firearms." *Gazzola v. Hochul*, 88 F.4th at 195–97 (observing that "right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms" (internal quotation marks omitted)). In *Gazzola,* this court ruled that purchase delays occasioned by sellers' need to comply with challenged safety requirements were not so restrictive as to threaten buyers' right to acquire firearms. *See id.* Nor are "short delay[s]" in gun acquisition resulting from compliance with normal license or registration processing requirements. *New York State Firearms Ass'n v. James*, 157 F.4th at 247; *Frey v. City of New York*, 157 F.4th at 141 (holding permit requirement that "merely imposes a brief delay on an individual's ability to carry concealed

---

[15] In upholding the denial of a plaintiff's motion for a preliminary injunction, the First Circuit recently held that a 72-hour waiting period to take possession of a purchased gun regulates conduct likely falling outside the plain text of the Second Amendment, *see Beckwith v. Frey*, 171 F.4th 560, 569 (1st Cir. 2026) (stating that waiting period "regulates conduct that occurs before a person keeps or carries a gun" and, therefore, need not satisfy *Bruen* step two), *petition for cert. filed*, No. 26-258 (Aug. 27, 2026). We need not decide how this court would view that particular rule. We note simply that this court has long recognized that ancillary constraints on the ability to acquire guns can implicate the text of the Second Amendment when they "meaningfully constrain individuals from keeping or bearing" arms. *United States v. Vereen*, 152 F.4th at 97; *see supra* at 16–17**.**

firearms within the City . . . does not amount to constitutional harm"); *see Antonyuk v. James*, 120 F.4th at 985 n.32 (stating that shall-issue permit process is "presumptively constitutional" notwithstanding "some delay" occasioned by the law); *see also Giambalvo v. Suffolk Cnty.*, 155 F.4th at 184 (declining to find waiting period of "more than 30 days is *per se* sufficiently lengthy to violate . . . Second Amendment rights").

This case, however, is not comparable. The challenged 90-day waiting period does not reflect the time necessary to effect presumptively constitutional licensing and registration requirements for the acquisition of firearms. Rather, as the City acknowledges, the purpose of the 90-day waiting period is to "regulate[]"—*i.e.*, to slow—"the pace of additional firearm acquisitions." Appellee Br. at 29. In short, the 90-day rule serves categorically to limit the acquisition and, therefore, the possession and carry, of multiple firearms. Like the Ninth Circuit, we conclude that where the purpose of an ancillary rule is thus to delay the exercise of Second Amendment rights, the rule is properly understood at step one of the *Bruen* analysis materially to constrain those rights. *See Nguyen v. Bonta*, 140 F.4th at 1243 (observing that "delay *itself* is the purpose" of rule limiting firearms purchases to one in 30-day period and concluding that such "monthly metering . . . meaningfully constrains the right to purchase and possess firearms" so as to satisfy *Bruen* step one (emphasis in original)).

The City explains that doing so serves the beneficent purpose of deterring multiple-gun purchases by straw buyers, who may then illegally transfer the weapons to others. Appellee Br. at 29. Perhaps so. But that raises the question whether rules limiting the acquisition, and thereby the possession and carry, of multiple firearms for such a purpose are consistent with the Nation's historic tradition of firearm regulation. That question is properly addressed at the second step of the *Bruen* analysis. At that step, a court might need to consider not only

whether there is a historic tradition of temporal limits on the acquisition of multiple firearms (the "how"), but also what purposes and circumstances justify such limits (the "why"). *See supra* at 13.

At step one, however, what matters is that the challenged 90-day rules seek in every case to delay licensed individuals' acquisition of handguns. As such, the rules materially constrain the right to keep and bear arms. Thus, dismissal of plaintiffs' facial and as-applied challenges to these rules at *Bruen* step one was unwarranted. The 90-day rules' constitutionality must be determined at *Bruen* step two.

**E. Carry License Registration Limit**

After repeal of the City rule limiting to a maximum of two the number of handguns that could be registered to a carry license, the district court dismissed as moot plaintiffs' facial challenge to that rule seeking declaratory and injunctive relief.[16] At the same time, the district court recognized plaintiff Mills to have standing to sue for retrospective damages on an as-applied challenge to the rule. In the end, however, it dismissed that claim pursuant to Rule 12(b)(6) at step one of the *Bruen* analysis, reasoning that the regulation only restricted a licensee's ability to satisfy his preferences as to which weapons to register (and, therefore, carry); it did not completely deprive the licensee of the ability to "possess and carry weapons in case of confrontation" as protected by the Second Amendment. *Mills v. New York City*, 758 F. Supp. 3d at 267 (citing *Heller*, 554 U.S. at 592). This reasoning does not persuade.

The challenged numerical limit on handguns registered to a carry license, when considered together with the law criminalizing the carry of any handgun

---

[16] Plaintiffs do not challenge this ruling on appeal and, thus, we do not discuss it further.

not registered to such a license, effectively prevented Mills from carrying all but two of his lawfully owned handguns for self-defense. For purposes of the *Bruen* step-one analysis, the rule thus regulates conduct covered by the plain language of the Second Amendment right to bear arms. As already explained, the plain language of the Amendment does not place a numerical limit on this right. *See supra* section II.C.[17] Nor does it protect against only permanent or complete infringement of the right. *See supra* section II.B.1.

In defending dismissal at *Bruen* step one on appeal, the City maintains that nothing in the language of the Second Amendment affords "a constitutional right to choose among an unlimited selection of handguns on demand." Appellee Br. at 42. To be sure, not every preference with respect to firearms warrants constitutional protection. In *Gazzola v. Hochul*, 88 F.4th at 197, this court observed that gun purchasers have "no right to have a gun store in a particular location," or "to travel no more than short distances to the most convenient gun store" (internal quotation marks omitted). The context in which we said so, however, was an appeal not from a judgment of dismissal but from the denial of a preliminary injunction sought by gun store owners raising, *inter alia*, derivative challenges to various safety regulations on them that they alleged would unduly burden the public's ability to acquire firearms. This court recognized the store owners' standing to bring such derivative claims, *see id.* at 194–95, and even recognized "a sufficient basis for that theory" of constitutional infringement, *id.* at 195. Nevertheless, we affirmed denial of a preliminary injunction, concluding that the store owners had failed to demonstrate likely success on the merits of their undue

---

[17] To be clear, by contrast to the earlier-discussed rule authorizing an individual to carry only one handgun on his person at a single time, *see supra* section II.C, the challenged registration rule did not permit a person to select that handgun from among any lawfully owned handgun but, rather, limited him to the two guns that he was permitted to register to his carry license.

burden theory. *See id.* at 198 (noting lack of record evidence that any gun stores "may close due to the challenged regulations" or that purchasers would be denied "relatively easy access to sellers of firearms").

Plaintiff Mills bore no such burden here in opposing the City's motion to dismiss. He needed only to plead a plausible claim, which, at step one of *Bruen*, required him to show that the challenged two-gun-registration rule regulated conduct covered by the plain language of the Second Amendment. *See New Hope Family Servs. v. Poole*, 966 F.3d at 181 (distinguishing between plaintiff's burden in moving for preliminary injunction and in defending against motion to dismiss). This he has done.

This case is further distinguishable from *Gazzola* in that, there, the challenged safety requirements imposed on gun store owners at best collaterally affected customers' right to acquire firearms by making it more expensive and difficult for gun-store owners to operate their businesses, thus potentially reducing the number of such stores. By contrast, the two-gun-registration rule directly impeded Mills's ability to carry weapons already lawfully owned by him by not permitting him to register all such guns to his carry license. As such, the rule regulates conduct covered by the plain text of the Second Amendment.

Nor is a different conclusion warranted by the fact that Mills might have switched out the two handguns registered to his carry license and substituted two others, a fact on which the district court appears to have placed some weight. *See Mills v. New York City*, 758 F. Supp. 3d at 267. The very need for such a switch meant that the challenged rule always prevented Mills from carrying a handgun otherwise in his lawful possession unless it was one of the two *then* registered to his carry license.

Here again, we do not conclude that a numerical limitation on the number of handguns that can be registered for carry is necessarily unconstitutional. We conclude only that because the rule here regulates conduct covered by the Second Amendment right to bear arms, plaintiffs' challenge should not have been dismissed at *Bruen* step one. Rather, constitutionality must be decided at *Bruen* step two, where the government bears the burden to show that the challenged two-gun-registration rule is consistent with the Nation's tradition of firearm regulation.

**F. Licensing and Fingerprinting Fees**

Plaintiffs fault the district court for dismissing their Second Amendment challenge to a $340 fee payable to secure a handgun license, and to renew that license every three years; as well as to a one-time fingerprinting fee of $88.50. *See* N.Y.C. Admin. Code § 10-131(a)(2) (license and renewal fee); N.Y. Penal Law § 400.00(4) (requiring fingerprints before license is issued or renewed). At the outset, we note that these fees operate as non-discriminatory, objective, shall-issue requirements, *i.e.*, the same fees apply to everyone, and everyone who pays the fees (and satisfies other non-fee requirements) is issued a license. Whether this claim is properly construed as a facial challenge, *see* Complaint ¶ 72 (asserting that "imposing a fee to exercise the rights protected under the Second Amendment is patently unconstitutional"), or an as-applied challenge, *see id.* ¶¶ 68–69 (alleging Holliday's inability to procure a license because he could not afford to pay fees), dismissal was warranted.

Turning first to Holliday's as-applied challenge, his assertion that he could not afford to pay the required fees is pleaded conclusorily and without any supporting factual allegations—*e.g.*, as to his financial status—as required to state a plausible claim for relief. *See Ashcroft v. Iqbal*, 556 U.S. at 678. Thus, we uphold the dismissal of his as-applied Second Amendment challenge.

Insofar as plaintiffs plead a facial challenge to the imposition of any fees to secure a handgun license, the claim is defeated by *Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013). In that pre-*Bruen* case, this court upheld the very licensing fees here at issue, ruling that a firearm licensing fee does not implicate Second Amendment rights so long as it is (1) "designed to defray (and does not exceed) the administrative costs associated with the licensing scheme" and (2) does not place "anything more than a marginal, incremental, or [] appreciable restraint" on an individual's Second Amendment rights. *Id.* at 166–67 (internal quotation marks omitted).

*Kwong*'s first principle was derived from "the Supreme Court's First Amendment fee jurisprudence," which permits government entities to impose licensing fees relating to the exercise of constitutional rights when the fees are designed "to meet the expense incident to the administration of the [licensing statute] and to the maintenance of public order in the matter licensed." *Id.* (quoting *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941)).[18] As noted *supra* at 18 n.9, in *Bruen* itself the Supreme Court has drawn on First Amendment jurisprudence in fashioning aspects of the two-step framework for reviewing Second Amendment challenges.

In *Bruen*, the Supreme Court recognized the possibility of licensing fees being so "exorbitant" as to deny ordinary citizens their Second Amendment rights publicly to carry firearms. *Bruen*, 597 U.S. at 38 n.9. As this court recently ruled, *Kwong*'s status as controlling law is "in no way undermined by the discussion regarding fees in *Bruen*." *New York State Firearms Ass'n v. James*, 157 F.4th at 247. The reason for that conclusion is obvious: *Kwong* safeguarded against the very

[18] Plaintiffs are thus mistaken in asserting that "[n]o other preexisting and fundamental right requires the payment of a fee before it can be exercised." Appellant Br. at 25.

possibility identified in *Bruen* by ruling that regulatory licensing fees do not implicate Second Amendment rights only so long as they are "designed to defray (and do[] not exceed) the administrative costs associated with the licensing scheme" and do not place anything more than a "marginal . . . restraint" on an individual's Second Amendment rights. *Kwong v. Bloomberg*, 723 F.3d at 166–67. This court has recognized the question of whether a fee imposes a "marginal or incremental burden" as "substantially similar" to the question of "whether the fee meaningfully constrains an individual's right to 'keep' and 'bear' arms." *New York State Firearms Ass'n v. James*, 157 F.4th at 247–48 (internal quotation marks omitted; alteration accepted). Thus, interpreting *Kwong* in light of *Bruen,* this court has held that a regulatory licensing fee that is "both calibrated to only defray administrative costs *and* is not prohibitively expensive does not meaningfully constrain an individual's ability to exercise his Second Amendment rights." *Id.* at 248.[19]

That is this case. While plaintiffs emphasize that City licensing fees are higher than those in other parts of New York State, they do not assert that the fees are excessive in relationship to the City administrative expenses they defray. Insofar as they attribute the high expenses to City administrative inefficiencies, they have not pleaded facts plausibly alleging that the licensing scheme has been "put toward abusive ends," *Bruen*, 597 U.S. at 38 n.9. In any event, as recognized in *Kwong v. Bloomberg*, 723 F.3d at 166, the challenged fees actually fall well short

---

[19] Whether an ancillary regulation meaningfully constrains Second Amendment rights might be understood as a first-step inquiry under *Bruen*. *See New York State Firearms Ass'n v. James*, 157 F.4th at 246. But, as noted *supra* at 22–23, *Bruen* footnote nine's reference to possibly exorbitant fees is located in the context of a discussion of the second-step inquiry. Predating *Bruen*, *Kwong* does not employ that two-step framework. Nevertheless, because *James* recognizes *Kwong,* viewed in light of *Bruen,* to remain controlling law in this circuit, we apply it here, understanding it to support dismissal of plaintiffs' fees challenge at *Bruen* step one and, in any event, at *Bruen* step two.

of the full administrative cost of licensing. Plaintiffs also do not allege that the fees are so exorbitant as effectively to deny ordinary citizens the right publicly to carry in every circumstance. Nor does it appear that they could plausibly do so. As the district court observed, the City's challenged fees have not increased since 2013, when they were upheld in *Kwong*, despite inflationary pressures over the last decade. *See Mills v. New York City*, 758 F. Supp. 3d at 268. Further, the pleadings show that Mills and Sotomayor were each able to pay the fees necessary to obtain City handgun licenses and to renew those licenses every three years. And, as already noted, Holliday's conclusory claim that he could not is unsupported by any alleged facts.

Accordingly, because plaintiffs' fees challenge fails to state a claim for which relief can be granted, we affirm the dismissal of those claims.

**CONCLUSION**

To summarize, we conclude as follows:

1. Plaintiffs, having failed plausibly to plead standing to mount Second Amendment challenges to the Purchase Authorization Rule, 38 R.C.N.Y. §§ 5-22(a)(9), 5-25(a), (c); the Handgun Registration Rule, *id.* § 5-22(a)(8); or the Dealer Reporting Requirements, N.Y.C. Admin. Code § 10-302.1(c)–(e), their claims as to these rules were properly dismissed for lack of jurisdiction. *See* Fed. R. Civ. P. 12(b)(1).

2. Plaintiffs' claims as to N.Y.C. Admin. Code § 10-131(a)(2)'s handgun application and fingerprinting fees were correctly dismissed pursuant to this court's decision in *Kwong v. Bloomberg*, 723 F.3d at 172.

3. Plaintiffs' remaining Second Amendment challenges should not have been dismissed for failure to state a claim at step one of the *Bruen* analysis. *See* Fed. R. Civ. P. 12(b)(6).

    a. The Second Amendment does not protect against only permanent or complete deprivations of the right to keep and bear arms.

    b. At step one of the *Bruen* analysis, a plaintiff defending against a motion to dismiss does not bear a burden to show that "challenged regulations are foreclosed by the text of the Second Amendment." *Mills v. New York City*, 758 F. Supp. 3d at 265.

    c. Title 38 R.C.N.Y. § 5-22(a)(7), limiting to one the number of handguns that a licensee may carry, restricts conduct protected by the plain text of the Second Amendment, satisfying step one of the *Bruen* analysis and requiring remand for consideration at step two of whether the government can demonstrate the rule's consistency with this Nation's historical tradition of firearm regulation.

    d. N.Y.C. Admin. Code §10-302.1(a)–(b), limiting to one the number of handguns that can be acquired within a 90-day period, meaningfully constrains conduct protected by the plain text of the Second Amendment, also satisfying *Bruen* step one and requiring remand for further consideration at step two.

    e. Title 38 R.C.N.Y. § 5-25(d)(4) (repealed 2024), limiting to two the number of handguns that can be registered at any one time to a carry license, restricted conduct protected by the plain text of the Second Amendment, satisfying step one of the *Bruen* analysis and requiring remand for further consideration at step two.

Accordingly, we **VACATE** so much of the December 5, 2024 judgment as dismissed claims raising Second Amendment challenges to 38 R.C.N.Y. § 5-22(a)(7) and § 5-25(d)(4) (repealed 2024) and N.Y.C. Admin. Code § 10-302.1(a)–(b), and we **REMAND** those claims to the district court for further proceedings consistent with this opinion.[20] In all other respects, we **AFFIRM** the judgment of dismissal.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

[20] In dismissing plaintiffs' claims at *Bruen* step one, the district court stated that plaintiffs' claims would "likely fail" at step two. *Mills v. New York City*, 758 F. Supp. 3d at 268. We understand this statement to be more suggestive than conclusory. On remand, we are confident the district court will reach a final conclusion only after engaging in the particularized historical analysis required at *Bruen* step two.